LLOYDS INSURANCE COMPANY OF AMERICA (PLAINTIFF), RESPONDENT-APPELLANT, v. O. H. MOBERLY, COMMISSIONER OF FINANCE OF THE STATE OF MISSOURI, C. E. LATIMER, SPECIAL DEPUTY COMMISSIONER IN CHARGE OF THE BUSINESS AND AFFAIRS OF THE FRANKFORD EXCHANGE BANK OF FRANKFORD, MO., A CORPORATION, AND THE FRANKFORD EXCHANGE BANK, FRANKFORD, MO., (DEFENDANTS), APPELLANTS-RESPONDENTS.—82 S. W. (2d) 139.

St. Louis Court of Appeals. Opinion filed May 7, 1935.

*Andrew J. Murphy, Davis Benning* and *Vivian Smith* for plaintiffs-appellants.

*Drake Watson* for defendants.

McCULLEN, J.—In this proceeding Lloyds Insurance Company of America sought to have a claim in the sum of $1800 adjudged a preferred claim against the funds and assets of the defunct Frankford Exchange Bank of Frankford, Missouri. A trial before the judge of the Circuit Court of Pike County, wherein the bank is located, resulted in a judgment denying the claim preference but ordering it classed and allowed as a common or ordinary claim in the sum above mentioned. From that judgment of the circuit court the plaintiff and the defendants have taken cross appeals. We have consolidated the appeals and will dispose of both in this opinion.

The claim had been duly filed and presented to the officers in charge of the liquidation of the defendant bank and had been rejected, after which, in due time, this suit was filed.

The record shows that Lloyds Insurance Company of America took over the assets and assumed the liabilities of the Detroit Fidelity & Surety Company and assumed that company's place in connection with the claim. Stephen D. Steele in March, 1927, was, and had been for sometime prior thereto, the duly appointed and acting guardian and curator of George Elmo Brice, a minor. O. H. Moberly, commissioner of finance of Missouri, and C. E. Latimer, special deputy commissioner of finance, are officially in charge of the liquidation of the affairs of the Frankford Exchange Bank of Frankford, Missouri. The bank ceased doing business and was taken in charge by the State's officers on October 7, 1931.

Stephen D. Steele, as guardian and curator, deposited and kept the moneys of Brice, his ward, in the Frankford Exchange Bank of Frankford, hereinafter referred to as the defendant bank. Brice was the grandson of Steele.

On March 5, 1927, Steele made written application to the Detroit Fidelity & Surety Company for guardian and curator's bond in the sum of $5000, in which application he named the defendant bank as the depository of the funds which were in his care as guardian and curator of the estate of Brice, the minor, whose age at that time

was ten years. In said application Steele agreed to give said surety company joint control of securities and cash belonging to the minor's estate.

In pursuance of the application, which was signed by Steele and endorsed by E. L. Corwine, attorney for the surety company, a bond in the sum of $5 00 was executed on March 5, 1927 by Steele as principal and the surety company as surety, binding them unto the State of Missouri, and conditioned upon the faithful discharge by Steele of his duties as such guardian and curator according to law. The bond was executed by the parties thereto before C. E. Latimer as notary public. Latimer, the notary public, was also cashier of the defendant bank at that time. The bond thus executed was duly filed and recorded in the probate court of Pike county on March 10, 1927.

At the time of the execution of the bond, a joint control agreement was entered into on behalf of the surety company, by Corwine, and on behalf of the defendant bank by Latimer, its cashier, whereby the defendant bank accepted and acknowledged notice from the surety company that the said company had become surety on Steele's bond as guardian and curator, and agreed not to honor or cash any check, draft or other legal written order drawn against the funds then deposited or thereafter to be deposited by Steele as said guardian and curator without the approval thereof by the surety company written thereon by one of its representatives, whose signatures appeared therein, or by such other persons as might thereafter be designated in writing by the surety company.

The joint control agreement between the surety company and defendant bank is contained in one document. The first part is dated Frankford, Missouri, March 5, 1927, and addressed to the defendant bank. The portion thereof with which we are concerned is as follows:

> "Re Stephen D. Steele, Guardian and Curator George Elmo Brice, a minor.

"Gentlemen:

"Please take notice that the Detroit Fidelity & Surety Company has become surety on the bond of the above described fiduciary, in connection with which is involved the responsibility of the proper distribution of all funds, moneys, securities or other assets now deposited or hereafter to be deposited with you by said fiduciary in his capacity as above described and that all checks, drafts, or other legal written orders drawn against said funds or accounts must be honored only when the approval thereof by the Detroit Fidelity & Surety Company is written thereon by one of the representatives of the Detroit Fidelity & Surety Company, whose signatures appear below. . . ."

It is signed for the surety company by E. L. Corwine, and con-. tains the signatures of representatives of the surety company, by E. L. Corwine, attorney in fact.

The second part of the document, also dated March 5, 1927, is as follows:

"Detroit Fidelity & Surety Company:

"We hereby acknowledge receipt of joint control notice dated March 5th, 1927, in connection with the bond of Stephen D. Steele, as guardian and curator George Elmo Brice, a minor.

"No withdrawals by this fiduciary will be permitted without consent of your representative.

"Balance on hand March 5th, 1927 of this account is $3.70.

"Frankford Exchange Bank,
"Frankford, Mo.,
"By C. E. Latimer, Cashier."

On April 2, 1928, which it will be noted was more than a year after the execution of the bond and the joint control agreement, Steele as guardian and curator had on deposit in the defendant bank a sum slightly in excess of $2000 belonging to his ward's estate. By a series of check transactions on April 2 and April 3, 1928, Steele took out of his ward's funds in the defendant bank the sum of $1800 and paid off his own pre-existing note which was secured by a deed of trust on his own farm. That loan had originally been made through the defendant bank and had been assigned by the bank to C. E. Latimer as guardian of two persons, and then had been assigned by Latimer as guardian to one W. S. Beavers, who was the holder and owner of the note and deed of trust securing the same at the time Steele used the funds of his ward's estate in payment thereof.

These check transactions by Steele were fully known to Latimer, the cashier of the bank, for he assisted Steele, Beavers and one W. N. Shaw in handling them and wrote out some of the checks himself in preparation for signatures.

The particular check out of which arises the claim of the surety company against the defendant bank was a check for $1800 signed by Steele as curator, payable to the order of W. N. Shaw and dated April 2, 1928. It was endorsed by Shaw and paid by the bank out of the minor's funds on the date thereof which was the day on which Shaw deposited it. The bank honored and paid this check without procuring the signature or approval of the surety company, or any of its agents. On the same day, April 2, 1928, Shaw gave Steele his check on the bank for $1800, payable to Steele's order. This check was deposited that day by Steele in his individual account in the bank. On the same day, Steele gave to W. S. Beavers a check drawn on Steele's individual account in the bank, payable to

Beavers or order in the sum of $1547.25 to pay off the note and deed of trust on Steele's own 240-acre farm. Beavers deposited Steele's check in the defendant bank either that day or the day following, and it was paid by the bank out of Steele's individual account. We deem it unnecessary to go into further details on this phase of the case. It is sufficient to say that the result of these various check transactions was that with money belonging to his ward's estate, Steele paid off a loan on his own farm, which loan prior thereto had encumbered the entire 240 acres whereas at the conclusion thereof only eighty acres of his farm were encumbered.

It is not disputed that the $1800 check in question was paid by the bank without the approval of the surety company. Latimer, the cashier, described the transactions between himself, Steele, Shaw and Beavers at the bank on April 2, 1928. He testified that he did not at that time think of the joint control agreement, and that he did not then or afterward take up with the surety company the matter of the $1800 check.

In November, 1928, Steele died, and his successor as guardian and curator of the minor's estate brought suit against the surety company on the bond to recover the loss which the minor's estate had sustained by reason of Steele's use of its funds. The surety company defended that suit. There was a verdict and judgment in the Circuit Court of Pike County in favor of the minor's estate and against the surety company. The judgment was affirmed on appeal and the surety company was required to and did pay to the minor's estate the sum of $1800 as well as certain expenses not necessary to notice here. It is this payment of $1800 upon which the plaintiff company as successor to the surety company bases its claim and seeks to have it declared a preferred claim.

Defendants contend that the joint control agreement is void as against public policy; that Steele never at any time authorized the bank to require the signature of anyone other than himself to checks on the minor's estate account; that, therefore, it was the duty of the defendant bank under the law to pay the $1800 check when it was drawn by Steele and that it would have been a civil wrong for the bank, under such circumstances, to have refused to honor the check. From this it is argued that the law will not assist or promote in one forum that which it declares wrong in another, and will not enforce one agreement based upon the violation of another. A number of cases are cited to support this contention. We are unable to agree with this view of the case. It cannot properly be said on this record that Steele did not authorize the bank to require the signature of anyone other than himself to checks on the account. Steele's agreement with the surety company, in writing, that the surety company should have joint control over the account, and the

bank's agreement in writing, through Latimer, its cashier, with the surety company that no withdrawals from the account by Steele would be permitted without the consent of the surety company's representative, constituted complete authority to the bank to refuse to honor Steele's checks as curator on the minor's funds unless the written approval of the surety company appeared thereon. There was nothing illegal or against public policy in such an agreement. Such an arrangement was clearly in the interest of conserving and protecting the minor's estate, and if carried out would have been a protection to all the parties concerned.

No right of any third person was in any manner adversely affected by such an agreement. The general rule with respect to this matter is stated in 7 C. J. page 642, Section 327, as follows:

"A bank deposit may be subject to any agreement which the depositor and the bank may make with respect to it, so long as the rights of third persons are not injuriously affected."

See, also, Farmers and Traders Bank v. Harrison, 321 Mo. 815, 824, 12 S. W. (2d) 755, 758.

Defendants argue that if the bank had refused payment on the check drawn by Steele as curator, it would have been liable in damages to Steele or to the payee or person properly presenting it. It is a sufficient answer to this argument to say that the bank's complete defense would have been Steele's authority to the surety company to do that very thing, notice of which authority was given to the bank by the surety company as Steele's agent. Furthermore, the bank, through its cashier, actually took part in making that very arrangement and specifically agreed to refuse to honor the curator's checks unless they bore the written approval of the surety company.

Defendants next contend that there was no consideration for the joint control agreement insofar as the bank was concerned. We are of the opinion that if any additional consideration were needed to support the bank's agreement to obey the instructions of its own depositor Steele with respect to the manner of honoring his checks as curator, the retention by the bank of the funds of the minor's estate was a sufficient consideration to the bank for agreeing to the arrangement. If the bank had not agreed to such an arrangement, Steele, who prior to the joint control agreement had complete control as curator over the funds deposited in the bank, could have withdrawn them from the bank and placed them elsewhere. We rule this point against defendants.

It is next contended by defendants that Latimer, the cashier, had no authority to bind the bank to such a thing as the joint control agreement in question. It is admitted by the parties that no resolution was ever passed by the board of directors of the defendant

bank authorizing the cashier to make such an agreement. Defendants argue that to hold that the cashier had authority to bind the bank by such an agreement would be equivalent to authorizing him to place a double liability on the bank in opposite directions, namely, lability to pay the depositor's checks and for damages for failure to so pay them, and liability to the surety company for paying them. We are unable to see how the bank could be held liable for refusal to pay its depositor's check when by such refusal it would be carrying out the depositor's own instructions. There certainly could not be any liability on the bank for doing with the depositor's funds the very thing which the depositor requested it to do, and which the bank had agreed to do.

As to the authority of the cashier, it seems clear that Latimer's action in agreeing for the bank to the joint control arrangement was the mere performance of an ordinary and usual duty of a cashier in a bank such as the defendant bank. A bank would have great difficulty in carrying on business if the law required its board of directors to meet and pass a resolution before a cashier would have authority to make arrangements with a depositor with respect to signatures on checks to be drawn against the depositor's account.

Our Supreme Court has given its approval to the following statement of the general rule on this subject as follows:

"The cashier of a bank is held out to the public as having authority to act according to the general usage, practice and course of business of such institutions. . . . In short, he is considered the executive officer of the bank through whom the whole moneyed operations of the bank, in paying or receiving debts, or in disposing or transferring securities, are conducted. . . ." [Bank v. Bank, 244 Mo. 554, 577, 149 S. W. 495.]

In Musgrove v. Macon County Bank, 187 Mo. App. 483, 490, 174 S. W. 171, 175, it was held that the cashier of a bank is its executive officer through whom its operations in paying or receiving deposits or in disposing of securities are conducted, and it was also held in that case that the acts of a cashier in the ordinary course of business are *prima facie* within the scope of his duties. [See, also, Wind v. Bank of Maplewood & Trust Co. (Mo. App.), 58 S. W. (2d) 332, 335.]

Under the evidence in this case we believe Latimer clearly had authority to bind, and did bind, the bank to the new arrangement for honoring and refusing to honor Steele's checks as curator.

Defendants contend that the surety company waived any rights it may have had to have the checks countersigned or approved by it because it took no action after other checks on the account were drawn, cashed and filed in the probate court without its signature. There is nothing in the record to show that the surety company had

any notice or knowledge of the honoring and paying by the defendant bank without the surety company's approval of Steele's checks as curator. The mere fact that the cancelled checks were filed in the probate court in the estate of the minor as receipts cannot be said to have constituted notice to the surety company that the bank was violating its agreement and was honoring such checks without the surety company's signature.

We know of no authority, and defendants cite none, holding that receipts in the form of paid checks in the files of a probate court constitute public records of such a character as to give notice to the world with respect to the signatures appearing or not appearing thereon.

In support of this point on waiver, defendants cite Reed v. Bankers Union, 121 Mo. App. 419, 426, 99 S. W. 55. A reading of that case discloses that the principles of law therein declared, when applied to the facts of the case at bar, not only do not support defendants' contention in this respect but clearly show there was no waiver in this case. In the Reed case the court quoted with approval from Bishop on Contracts as follows:

"Waiver is where one in possession of any right, whether conferred by law or by contract, and of full knowledge of the material facts, does or forbears the doing of something inconsistent with the existence of the right or of his intention to rely upon it; thereupon he is said to have waived it, and he is precluded from claiming anything by reason of it afterward." [Reed v. Bankers Union, supra.]

There is no evidence whatsoever in this record to show that the surety company had "full knowledge of the material facts" concerning the bank's violation of its agreement. Therefore, having no knowledge of the honoring by the bank of the checks mentioned, it cannot be said that the surety company waived its right to complain of the bank's violation of its agreement. [See, also, Wilson v. Illinois Life Ins. Co., 221 Mo. App. 1007, 1013, 300 S. W. 550, 553.]

Defendants next contend that the court erred in overruling defendants' motion to strike, in overruling defendants' motion to require plaintiff to separately plead, in overruling defendants' motion to require plaintiff to elect, and in overruling defendants' demurrer to the petition. It would unnecessarily lengthen this opinion if we were to take up these several contentions separately. We have examined the record and find that the petition of the plaintiff surety company clearly stated a cause of action based upon the violation by the defendant bank of the joint control agreement referred to. While it is true there are allegations in the petition setting forth in unnecessary detail the circumstances under which Latimer, the cashier of the bank, took part in the several check transactions and the

transfers of Steele's farm, we do not believe such allegations were anything more than descriptive matter. They do not rise to the dignity of stating causes of action in fraud or negligence. They might well have been stricken out, but since the case was tried before the court and not before a jury, we do not believe that the court's action in refusing to strike them out materially affected the merits of the action between the parties. No material rights of the defendants were prejudiced, and therefore the court's action in this respect did not constitute reversible error. [Section 1062, Revised Statutes Missouri 1929 (Mo. Stat. Anno., Sec. 1062, p. 1352).]

Under the evidence in this case we are satisfied that the court's action in holding that the defendant bank was liable to the surety company for the loss it suffered through the violation by the bank of the joint control agreement was correct.

We shall now consider whether the court committed error, as the plaintiff insurance company contends it did, in refusing to order its claim against the defendant bank to be classified as a preferred claim.

In support of its contention, plaintiff cites the case of Arnall v. Commercial Bank of Wellsville (Mo. App.), 45 S. W. (2d) 909. A mere reading of that case shows that the facts upon which the court held that the claim involved therein was entitled to a preference are clearly distinguishable from the facts in the case at bar. With respect to that portion of the claim in the Arnall case which was held to be entitled to a preference, this court said:

"In this instance the bank took over the funds not only with knowledge that they constituted trust funds to be invested in a particular manner, *but indeed under an express agreement as to their management which if carried out by the parties thereto gave rise to the relation of trustee and cestui que trust between the bank and Arnall.*" [Arnall v. Commercial Bank of Wellsville (Mo. App.), 45 S. W. (2d) 909, 911.] (Emphasis ours.)

The emphasized portion of the above quotation from the opinion in the Arnall case clearly distinguishes that case from the case at bar. There is no evidence whatsoever in the record in the case at bar showing any agreement, either express or implied, whereby the bank undertook to manage the funds held by Steele as curator, nor is there anything in the record to show that the deposits made in the bank by him as curator were in any sense special deposits. There is no evidence to show that the funds belonging to the minor's estate deposited in the bank either before or after the execution of the joint control agreement were anything but general deposits, title to which passed to the bank, thereby creating the relationship of debtor and creditor between the bank and the depositor of the funds. By entering into the joint control agreement, the bank did not in

any wise change that relationship to one of trustee and *cestui que trust*. It merely agreed that from that time forward it would require two signatures to checks drawn against those funds instead of one as the arrangement theretofore in existence between the bank and Steele as curator contemplated.

It was the bank's duty to honor and pay checks properly drawn after the joint agreement just as it was its duty to honor and pay checks properly drawn before the joint agreement. Under the evidence the bank had no other duty with respect to the funds in question. There is no claim that the bank wrongfully acquired the deposit and no evidence upon which the bank could be held to be a trustee *ex maleficio*. Hence, there is nothing in the record to warrant a finding that a trust relationship existed which would entitle the surety company's claim to a preference over other creditors of the bank.

As was said by our Supreme Court in a case which has been widely cited:

"The fact that the deposit was of a trust fund, and known to the bank to be such, would not of itself make the bank a trustee of the fund for the benefit of the *cestui que trust*. In order to have that effect there must have been something in the circumstances of the deposit to constitute it a special, as contradistinguished from a general, deposit, into which two classes all deposits in commercial banks may be divided. If the deposit belonged to the former class the fiduciary relation might well arise; if to the latter, in the absence of *mala fides*, it could not do so, for by a general deposit in good faith the title to the fund deposited passed. The bank became the owner thereof, the relation of debtor and creditor, and not that of trustee and *cestui que trust*, was creater." [Paul v. Draper, 158 Mo. 197, 200, 59 S. W. 77.]

In the same case the Supreme Court quoted with approval from Fletcher v. Sharpe, 108 Ind. 276, as follows:

"When deposits are received, unless they are special deposits, they belong to the bank as a part of its general funds, and the relation of debtor and creditor arises between the bank and the depositor. This is equally so whether the deposit is of trust moneys, or funds which are impressed with no trust, provided the act of depositing is no misappropriation of the fund." [Paul v. Draper, supra, l. c. 202. See, also, Duzan v. Cantley, 227 Mo. App. 670, 671, 55 S. W. (2d) 711, 712; Parker v. Central Trust Co. (Mo. App.), 71 S. W. (2d) 106, 108.]

Nothing appearing in the record to show any sort of trust relationship on the part of the bank with respect to the funds deposited and held by Steele as curator, the action of the circuit court in refusing to order the claim of the plaintiff classified as a preferred

claim was correct, as was the court's action in allowing the claim as a general claim. The judgment of the circuit court is therefore in all respects affirmed. *Becker, J.,* concurs. *Hostetter, P. J.,* not sitting.